IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

JEANNIE R. ALBANO,                    )  Civil No.: 3:13-cv-01303-JE
                                      )
            Plaintiff,                )  FINDINGS AND
                                      )  RECOMMENDATION
      v.                              )
                                      )
CAROLYN W. COLVIN,                    )
Acting Commissioner of Social Security,)
                                      )
            Defendant.                )
_____)

      George J. Wall
      Law Offices of George J. Wall
      1336 E Burnside, Suite 130
      Portland, OR 97214

          Attorney for Plaintiff

      Bill Williams, Acting U.S. Attorney
      Adrian L. Brown, Asst. U.S. Attorney
      1000 S.W. 3rd Avenue, Suite 600
      Portland, OR 97204

      Kathy Reif
      Special Asst. U.S. Attorney
      Office of the General Counsel
      Social Security Administration
      701 5th Avenue, Suite 2900 M/S 221 A
      Seattle, WA 98104-7075

          Attorneys for Defendants

FINDINGS AND RECOMMENDATION – 1

JELDERKS, Magistrate Judge:

Plaintiff Jeannie Albano brings this action pursuant to 42 U.S.C. § 405(g) seeking judicial review of a final decision of the Commissioner of Social Security (the Commissioner) denying her application for Supplemental Security Income (SSI) benefits under the Social Security Act (the Act). Plaintiff seeks an Order remanding the action to the Social Security Administration (the Agency) for an award of benefits.

For the reasons set out below, the Commissioner's decision should be affirmed.

## Procedural Background

Plaintiff filed her application for SSI on September 3, 2009, alleging that she had been disabled since August 20, 1994.

After her claims had been denied initially and on reconsideration, Plaintiff timely requested an administrative hearing.

On March 1, 2012, a hearing was held before Administrative Law Judge (ALJ) Catherine Lazuran. Plaintiff and Gary Jesky, a Vocational Expert (VE), testified at the hearing. At the hearing, Plaintiff amended her alleged onset date to July 9, 2009.

In a decision dated March 26, 2012, ALJ Lazuran found that Plaintiff was not disabled within the meaning of the Act. That decision became the final decision of the Commissioner on May 31, 2013, when the Appeals Council denied Plaintiff's request for review. In the present action, Plaintiff challenges that decision.

## Background

Plaintiff was born in 1966 and was 46 years old at the time of the ALJ's decision. She attended school through the 9th grade and has no past relevant work, although, as noted below,

she performed some work more than 15 year prior to the ALJ's decision.[1]

## Disability Analysis

The ALJ engages in a five-step sequential inquiry to determine whether a claimant is disabled within the meaning of the Act. 20 C.F.R. §§ 404.1520, 416.920. Below is a summary of the five steps, which also are described in Tackett v. Apfel, 180 F.3d 1094, 1098-99 (9th Cir. 1999).

Step One. The Commissioner determines whether the claimant is engaged in substantial gainful activity (SGA). A claimant engaged in such activity is not disabled. If the claimant is not engaged in substantial gainful activity, the Commissioner proceeds to evaluate the claimant's case under Step Two. 20 C.F.R. § 404.1520(b).

Step Two. The Commissioner determines whether the claimant has one or more severe impairments. A claimant who does not have such an impairment is not disabled. If the claimant has a severe impairment, the Commissioner proceeds to evaluate the claimant's case under Step Three. 20 C.F.R. § 404.1520(c).

Step Three. Disability cannot be based solely on a severe impairment; therefore, the Commissioner next determines whether the claimant's impairment "meets or equals" one of the presumptively disabling impairments listed in the Social Security Administration (SSA) regulations, 20 C.F.R. Part 404, Subpart P, Appendix 1. A claimant who has such an impairment is disabled. If the claimant's impairment does not meet or equal an impairment listed in the regulations, the Commissioner's evaluation of the claimant's case proceeds under Step Four. 20 C.F.R. § 404.1520(d).

---

[1] See 20 C.F.R. § 404.1560(b)(1)("[p]ast relevant work is work that you have done within the past 15 years, that was substantial gainful activity, and that lasted long enough for you to learn to do it.")

FINDINGS AND RECOMMENDATION – 3

Step Four. The Commissioner determines whether the claimant is able to perform relevant work he or she has done in the past. A claimant who can perform past relevant work is not disabled. If the claimant demonstrates he or she cannot do work performed in the past, the Commissioner's evaluation of the claimant's case proceeds under Step Five. 20 C.F.R. § 404.1520(f).

Step Five. The Commissioner determines whether the claimant is able to do any other work. A claimant who cannot perform other work is disabled. If the Commissioner finds that the claimant is able to do other work, the Commissioner must show that a significant number of jobs exist in the national economy that the claimant can do. The Commissioner may satisfy this burden through the testimony of a vocational expert (VE) or by reference to the Medical-Vocational Guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2. If the Commissioner demonstrates that a significant number of jobs exist in the national economy that the claimant can do, the claimant is not disabled. If the Commissioner does not meet this burden, the claimant is disabled. 20 C.F.R. § 404.1520(g)(1).

At Steps One through Four, the burden of proof is on the claimant. Tackett, 180 F.3d at 1098. At Step Five, the burden shifts to the Commissioner to show that the claimant can perform jobs that exist in significant numbers in the national economy. Id.

## Medical Record

The relevant parts of the medical record are summarized below.

Plaintiff's treatment notes with Dr. Milano date from October 30, 2006 to January 12, 2012. Dr. Milano also provided a Mental Residual Functional Capacity Assessment (MRFCA) dated January 12, 2012[Tr. 792-796] and a letter dated February 23, 2012 to Plaintiff's attorney discussing her opinion of Plaintiff's vocational impairments. [Tr. 810]

FINDINGS AND RECOMMENDATION – 4

Dr. Milano's treatment notes document the counseling and medication management she provided Plaintiff for her diagnoses of depression, anxiety, bipolar disorder and history of methamphetamine use. The medical record reflects that Plaintiff was involuntarily committed to the hospital twice in 1998, twice in 2002, and at least three times between June and November 2009. Treatment notes indicate that Plaintiff last used methamphetamines in November, 2010 and that Plaintiff's mental health had been "stable" since March 2010.

Plaintiff also received mental health services from the community mental health clinic, Luke-Dorf, Inc. ("Luke-Dorf"). In addition to counseling, Luke-Dorf also prescribed Plaintiff psychiatric medications until December 29, 2010. It then discontinued this service due to concerns about two non-coordinating physicians prescribing Plaintiff's psychiatric medications [Tr. 617] and disagreement with Plaintiff's primary care provider, Dr. Milano, regarding prescribing Plaintiff antidepressants. [Tr. 801]

In treatment notes dated November 25, 2009, shortly after Plaintiff's discharge from a psychiatric hospitalization for a manic episode, Dr. Milano reported that she was taking Plaintiff off Zoloft and would not be continuing any SSRI (antidepressant) prescriptions for her. Plaintiff was prescribed Abilify, Buspar and Klonopin. Dr. Milano noted that Plaintiff was doing "well," and had experienced no manic or psychotic episodes. In notes of a visit dated December 16, 2009, Dr. Milano remarked that Plaintiff was "doing well with Abilify," and was taking her medication as prescribed. During an office visit dated December 30, 2009, Plaintiff reported that she had been evicted from her sister's home and had no place to stay that night. Dr. Milano reported that Plaintiff's mood and affect were "full," her speech was rapid as in prior appointments, and she exhibited no psychomotor agitation, frank delusions or psychosis.

In office visit notes dated February 10, 2010, Dr. Milano reported that Plaintiff's mood had stabilized on Abilify, Buspar and Klonopin but that Plaintiff reported she felt "overly sedated." Plaintiff's mood and affect were "congruent," she maintained normal eye contact and displayed no psychomotor agitation. Plaintiff reported that she was living in a shelter and was on a waitlist for housing. On February 24, 2010, Plaintiff told Dr. Milano that she felt that her manic symptoms were well controlled on her current regimen.

In notes of a visit on March 25, 2010, Dr. Milano indicated that Plaintiff was doing well and taking all medication as prescribed. Plaintiff had "excellent grooming," and displayed a calm voice, mildly pressured speech improved over prior visits, normal eye contact, and no psychomotor agitations, delusional behavior or psychosis.

During a visit to Luke-Dorf on April 5, 2010, Plaintiff appeared more anxious and agitated than at her initial interview. Plaintiff reported that she "wants off Klonopin" and was hopeful that the prescriber at Luke-Dorf would be able to find a medication that was not a controlled substance that would help her sleep.

In office visit notes dated April 10, 2010, Dr. Milano noted that Plaintiff was taking medications as prescribed, was following through with all social service appointments and that her mood was stable.

In notes from a Psychiatric Diagnostic Interview with Luke-Dorf, Plaintiff reported she was taking extra Buspar and Klonopin to help her sleep. Treatment notes indicate that Plaintiff would be started on trazodone to help her sleep and that Dr. Milano was notified that Luke-Dorf would be taking over all mental health medication prescriptions.

During a Luke-Dorf visit on April 12, 2010, Plaintiff reported that trazodone was not helping her sleep but that, aside from poorer sleep, her mood was "good."

FINDINGS AND RECOMMENDATION – 6

During a visit with Luke-Dorf on April 26, 2010, Plaintiff reported that she had moved into her own apartment. Plaintiff reported she was excited about having her own apartment but it was a "stressful time." Plaintiff reported that the prescribed trazodone was not effective in helping her sleep and higher doses made her "groggy" and tired the next day. Plaintiff reported that she had low energy and low mood, was mostly stressed about finances and not being able to see her mother. Plaintiff reported that overall she was feeling hopeful and doing well on Abilify and Buspar. Her primary complaint was not being able to sleep. Notes indicate that Plaintiff appeared well-groomed and appropriately dressed, was pleasant and cooperative, psychomotor activity was normal, speech rather rapid and pressured, and her thought processes were organized and logical. Plaintiff's trazodone prescription was discontinued and she was prescribed amitriptyline for sleep.

In a chart note dated April 28, 2010, Dr. Milano wrote that Plaintiff's bipolar disorder was "WELL (sic) controlled with Abilify and Buspar, aside from insomnia." Plaintiff had obtained an apartment through social services and was receiving counseling services from Luke-Dorf.

Luke Dorf notes from April 29, 2010 commented that Plaintiff was active in advising staff of her needs and "appears quite adept at getting her needs met." Plaintiff reported that she was feeling stressed but that she felt she was handling it well.

In Luke-Dorf treatment notes dated May 24th and 27th, 2010, Plaintiff reported continued problems with isolation and difficulty sleeping. Plaintiff had not attended treatment as agreed and reported low mood. Plaintiff was offered suggestions for exercise and socialization and agreed to start walking 10 minutes a day and begin group attendance.

During a visit to Luke-Dorf on May 27, 2010, Plaintiff reported that amitriptyline was "making me sleep too much and making me depressed." She reported that she was initially taking 25mg but increased her dosage to 50mg when the lower dosage did not help. She reported she was feeling too sedated and groggy and did not have the energy to get out of bed in the morning. Plaintiff denied any other symptoms of depression and stated that she just felt tired. She denied any problems or side effects from Buspar or Abilify and stated that those medications were working well. It was recommended that Plaintiff try one and a half tabs of amitriptyline and was asked to try an antidepressant like Cymbalta "since she had not been on one with a mood stabilizer in place."

In treatment notes dated June 10, 2010, Dr. Milano indicated that Plaintiff had discontinued use of Cymbalta because of side-effects. Plaintiff also reported that she was feeling depressed due to social isolation in her apartment and was missing the social contact of the shelter environment. Plaintiff reported that she was planning to see her son and had renewed contact with her sisters but had missed attending group sessions at Luke-Dorf and was not getting out of her apartment much.

Luke-Dorf notes from August 10, 2010 indicated that Plaintiff had not been attending appointments and was no longer engaged in substance abuse treatment. The provider expressed concern that Plaintiff may have relapsed.

During a visit to Luke-Dorf on August 12, 2010, Plaintiff reported that Dr. Milano had discontinued the Cymbalta Luke-Dorf had prescribed and "was upset" that Plaintiff was on an antidepressant. Plaintiff reported that Dr. Milano had increased her Abilify from 15mg to 30mg. Plaintiff reported she felt very depressed, flat and tired, and lacked energy. She reported staying in bed too much and sleeping too much. Luke-Dorf notes indicate that Dr. Milano's office was

FINDINGS AND RECOMMENDATION – 8

contacted due to concerns that Plaintiff was receiving psychiatric medications from both Luke-Dorf and Dr. Milano's office and to clarify the reasons why Plaintiff could not take an antidepressant. When asked whether she wanted her primary care physician to continue managing her psychiatric medications, Plaintiff indicated that she wanted Luke-Dorf to prescribe them. The Luke-Dorf provider opined that Plaintiff appeared a good candidate

> to get back on an SSRI. She was on Zoloft without any mood stabilizers for about 10 years with good symptom control and then had what appeared to be a manic episode. She is now on a mood stabilizer and it may be appropriate to start her on a small dose of Zoloft or another antidepressant again. This is what she is requesting.

During a Luke-Dorf visit on August 23, 2010, Plaintiff reported continued feelings of fatigue and expressed a desire to be prescribed Zoloft. Plaintiff was started on Zoloft and directed to make sure she took her mood stabilizer daily and notified Luke-Dorf of any worsening symptoms or side effects.

In notes of a visit with Dr. Milano dated November 4, 2011, Plaintiff's mood and affect were congruent, eye contact was normal, and she exhibited some pressured speech but no psychomotor agitation, delusions or psychosis. Dr. Milano remarked that Plaintiff's mental health had been "very stable;" however' she was concerned about the restart of Zoloft and noted that Plaintiff admitted to recent methamphetamine use.

Luke-Dorf treatment notes dated December 29, 2010, indicated that Plaintiff was notified she would no longer be getting psychiatric medications through the agency.

During a March 24, 2011, Integrated Assessment at Luke-Dorf, Plaintiff reported low energy, fatigue, low motivation and increased sleep. She described these symptoms as having been present most days for the previous three months. Notes indicated that Plaintiff had minimal engagement in mental health treatment and frequently missed appointments. Plaintiff managed

FINDINGS AND RECOMMENDATION – 9

her activities of daily living independently and spent her time doing crossword puzzles, watching TV, and listening to the radio. She reported that she had been taking an antidepressant for a few months at one point in the past and felt that it had helped but that her primary care physician had discontinued the prescription out of concern it would induce a manic episode. Plaintiff's medications no longer included Zoloft. Plaintiff's dress and hygiene were appropriate; speech was normal but fast; mood was euthymic; thought formation was goal directed; attention, verbal ability, judgment and concentration were normal and memory was intact. Plaintiff could spell the word "world" forward and backward, discuss the abstract meaning of metaphors, count backwards from 100 by 3s, recall 3 of 3 objects after five minutes and demonstrated "fairly good insight into her symptoms of mental illness" although she reported very few symptoms.

In notes of a visit dated June 29, 2011, Dr. Milano reported that Plaintiff had had a "protracted absence from care." Plaintiff reported that she was depressed and "lying around all day" but had resumed a relationship with her mother, remained sober and off opiates and had no manic breaks. Plaintiff "strongly desire[d]" a retrial of Zoloft which Dr. Milano agreed to on condition of a clear medication management agreement with monthly visits for refills and Plaintiff's continued use of Abilify. Plaintiff was prescribed Zoloft, 25mg per day.

During an office visit on July 20, 2011, Plaintiff requested a higher dose of Zoloft and reported she was spending most days in bed. Plaintiff maintained eye contact and displayed congruent, flat mood and affect, no tearfulness or psychomotor agitation. Her attention, judgment and insight were moderate and her rate of speech was consistent with baseline. Dr. Milano increased Plaintiff's Zoloft to 50mg per day.

On August 17, 2011, Plaintiff reported to Dr. Milano that her mother had died two weeks previously and she was helping to plan the funeral. She reported mostly spending days indoors and thought the higher dose of Zoloft might be helping but she wasn't sure.

On September 28, 2011, Plaintiff reported to Dr. Milano that her mother's funeral "went OK" and she had seen one of her sons. She had travelled to Oak Harbor for two weeks to see her other son and had also travelled to visit an uncle. Plaintiff reported she was still in contact with her case manager at Luke-Dorf and was willing to restart therapy. Dr. Milano noted improved overall mood and level of activity since prior appointment and no evidence of mania on exam. Plaintiff was instructed to discontinue metoprolol which Dr. Milano commented may have been contributing to her fatigue.

During an office visit on October 26, 2011, Plaintiff reported that she had been feeling better since discontinuing metoprolol. She had been shopping three times, one with a friend and had gone to get her hair done. She reported having a "casual friend" with whom she was having weekly sexual relations. Dr. Milano noted congruent mood/affect; normal eye contact; intact attention, judgment, and insight; and no psychomotor agitation.

On January 12, 2012, Plaintiff reported low energy and requested an increase in her Zoloft dosage given "how good I felt" when taking 100mg. Dr. Milano noted flat affect, rapid speech at baseline, no psychosis and moderate to good insight and judgment. Dr. Milano agreed to a slight increase in Zoloft as there was no evidence of mania and Plaintiff had complied with her medication management plan thus far.

### ALJ's Decision

At the first step of her disability analysis, the ALJ found that Plaintiff had not engaged in substantial gainful activity since her alleged onset of disability on July 9, 2009.

FINDINGS AND RECOMMENDATION – 11

At the second step, the ALJ found that Plaintiff's bipolar or depressive disorder and history of drug abuse with psychotic symptoms were severe impairments.

At the third step, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or equaled a presumptively disabling impairment set out in the listings, 20 C.F.R. Part 404, Subpart P., App. 1.

The ALJ next assessed Plaintiff's residual functional capacity (RFC).  She found that Plaintiff retained the capacity to perform a full range of work at all exertional levels except that she was limited to simple routine tasks not involving working directly with the public or closely with co-workers and should avoid moderate exposure to hazards such as unprotected heights and dangerous machinery. The ALJ found that Plaintiff's allegations of disabling pain and other symptoms were not entirely credible.

At the fourth step, the ALJ determined that Plaintiff had no past relevant work.

Based upon the VE's testimony, at the fifth step, the ALJ found that Plaintiff could perform jobs that existed in substantial numbers in the national economy. The ALJ cited janitor and laundry worker as examples of work Plaintiff could perform.  Because she found that Plaintiff could perform such work, the ALJ concluded that Plaintiff was not disabled within the meaning of the Act.

## Standard of Review

A claimant is disabled if he or she is unable "to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  Claimants bear the initial burden of establishing disability. Roberts v. Shalala, 66 F.3d 179, 182 (9th Cir. 1995), cert. denied, 517 U.S. 1122 (1996).  The Commissioner bears the

FINDINGS AND RECOMMENDATION – 12

burden of developing the record, DeLorme v. Sullivan, 924 F.2d 841, 849 (9th Cir. 1991), and bears the burden of establishing that a claimant can perform "other work" at Step Five of the disability analysis process. Tackett, 180 F.3d at 1098.

The district court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record as a whole. 42 U.S.C. § 405(g); see also Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). "Substantial evidence means more than a mere scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Andrews, 53 F.3d at 1039. The court must weigh all of the evidence, whether it supports or detracts from the Commissioner's decision. Martinez v. Heckler, 807 F.2d 771, 772 (9th Cir. 1986). The Commissioner's decision must be upheld, however, even if "the evidence is susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1039-40.

## Discussion

Plaintiff contends that the ALJ improperly rejected the opinion of her treating physician, Dr. Christina Milano, MD.

Because treating physicians have a greater opportunity to know and observe their patients, their opinions are given greater weight than the opinions of other physicians. Rodriguez v. Bowen, 876 F.2d 759, 761–62 (9th Cir.1989). An ALJ must provide clear and convincing reasons for rejecting a treating physician's uncontroverted opinions, Lester v. Chater, 81 F.3d 821, 830–31 (9th Cir.1995), and must provide "specific, legitimate reasons ... based upon substantial evidence in the record" for rejecting opinions of a treating physician which are contradicted. Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir.1989) (citations omitted).

In her MRFCA, Dr. Milano checked boxes indicating her opinion that Plaintiff had no limitations in understanding and memory; moderately severe to severe limitations in sustained concentration and persistence; severe limitations in her ability to interact appropriately with the general public, customers, and co-workers; severe limitations in her ability to set realistic goals or make plans independently; moderate limitations in her ability to travel in unfamiliar settings and use public transportation; and severe limitations in her ability to respond appropriately to expected or unexpected changes in a work setting or routine.  Dr. Milano marked all listed typical workplace stressors as likely to increase Plaintiff's level of impairment and opined that Plaintiff's conditions had existed to this degree of severity at least since childhood.

The ALJ acknowledged that Dr. Milano was Plaintiff's treating physician but gave her opinion "little weight" because it "appear[ed] based on claimant's subjective reporting of symptoms and  [was] inconsistent with the record as a whole, including Dr. Milano's treatment notes which repeatedly refer to claimant as in no apparent distress and having a stable or improved bipolar disorder."(Tr. 25) The ALJ also found that Dr. Milano's opinion that Plaintiff's limitations have been present since childhood was inconsistent with records showing that Plaintiff worked between the years of 1982 and 1994. Id.

Here, the ALJ was required to provide "specific, legitimate reasons ... based upon substantial evidence in the record" for her rejection of Dr. Milano's opinion.  The ALJ's dismissal of that opinion on the grounds that Dr. Milano described Plaintiff's impairments as having existed at least since childhood when the record indicated that Plaintiff had performed some work in the distant past did not meet this requirement.  Dr. Milano's opinion indicates that Plaintiff would not have been expected to maintain employment throughout adulthood.  Plaintiff's limited work history shows that she held eight different low-wage jobs when she was

FINDINGS AND RECOMMENDATION – 14

between the ages of 16 and 28.  Many of those jobs she held for no more than a year. The record contains little information regarding the nature of the work and no information about how Plaintiff performed in these positions. Nor is there any information about why Plaintiff separated from any of the jobs. This sparse history, without more, is insufficient to support the ALJ's rejection of Dr. Milano's opinion regarding the current severity of Plaintiff's limitations.

Despite this error, the ALJ did provide an adequate basis for rejecting Dr. Milano's opinion because her conclusion that it was inconsistent with the doctor's own and other medical opinions in the record was specific, legitimate, and supported by substantial evidence in the record. In support of her conclusions, the ALJ cited a number of Dr. Milano's records that noted that Plaintiff's mental health "has been very stable," that her bipolar disorder "appears to be well controlled on current meds," and that she had not had any episodes of mania.  The ALJ also cited March 2011 treatment notes from Luke-Dorf that described Plaintiff as pleasant and cooperative, with rapid but on-topic and goal directed speech and good attention and concentration.  Notes also indicated that Plaintiff was alert and oriented, could spell the word "world" backward and forward and could recall three of three objects after five minutes.  The ALJ also noted that Luke-Dorf providers indicated that Plaintiff had "fairly good insight into her symptoms and mental illness but she, in fact, reports very few symptoms."  The ALJ noted GAF scores assigned to Plaintiff by other treatment providers that indicated a higher level of functioning than described by Dr. Milano.  Based on my review of the record, I conclude that it was reasonable for the ALJ to find that both Dr. Milano's notes and other treatment notes in the record document significantly less severe functional limitations than those reflected in Dr. Milano's MRFCA or opinion letter.

FINDINGS AND RECOMMENDATION – 15

The ALJ also gave Dr. Milano's opinion little weight because she found that it appeared to be based in large part on Plaintiff's subjective symptoms. In her decision, the ALJ discounted Plaintiff's credibility and Plaintiff does not challenge that finding. Therefore, the ALJ could properly discount medical opinion that was based upon Plaintiff's complaints as well. See Tonapetyan v. Halter, 242 F.3d 1144, 1149 (9th Cir.1999); Morgan v. Commissioner, 169 F.3d 595, 602 (9th Cir.1999) (doctor's opinion premised on claimant's accounts of symptoms and limitations may be disregarded if claimant's complaints properly discounted). A review of Dr. Milano's records supports the ALJ's conclusion that her opinions concerning the severity of Plaintiff's symptoms were based to a significant extent on Plaintiff's own subjective reports. The ALJ's conclusions that Plaintiff was not credible and that Dr. Milano based her evaluation of Plaintiff's functional capacity on Plaintiff's subjective complaints provided substantial support for her rejection that opinion.

Although Plaintiff is correct that the record contains treatment notes citing Plaintiff's struggles with depression, anxiety and fatigue, the overall picture reflected in the record is one of improvement and symptom management as Plaintiff remained off amphetamines and complied with her treatment and as her treatment providers balanced her psychiatric medications. The ALJ is responsible for evaluating medical evidence, Carmickle v. Commissioner, 533 F.3d 1155, 1164 (9th Cir.2008), and for resolving ambiguities in the medical evidence. Tommasetti v. Astrue, 533 F.2d 1035, 1041 (9th Cir.2008). I find no grounds to disturb the ALJ's decision to give Dr. Milano's opinion little weight based on the cited inconsistencies between the doctor's opinions and her own notes and the other medical evidence of record.

A careful review of the ALJ's decision and the administrative record fully supports the conclusion that the ALJ's reasons for rejecting Dr. Milano's opinion were legally and factually

FINDINGS AND RECOMMENDATION – 16

sound. Therefore, her findings must be affirmed even if the evidence is "susceptible to more than one rational interpretation." Magallanes, 881 F.2d at 750, citing Gallant v. Heckler, 753 F.2d 1450, 1453 (9th Cir.1984); see also Jamerson v. Charter, 112 F.3d 1064, 1067 (9th Cir.1997) ("[T]he key question is not whether there is substantial evidence that could support a finding of disability, but whether there is substantial evidence to support the Commissioner's actual finding that claimant is not disabled."). "Where 'the evidence can reasonably support either affirming or reversing a decision, we may not substitute our judgment for that of the [ALJ].'" Garrison v. Colvin, 759 F.3d 995, 1010 (9th Cir. 2014), citing Andrews, 53 F.3d at 1039. Accordingly, the Commissioner's decision should be affirmed.

## Conclusion

For the reasons set out above, the Commissioner's decision should be AFFIRMED and a Judgment should be entered DISMISSING this action with prejudice.

## Scheduling Order

This Findings and Recommendation will be referred to a district judge. Objections, if any, are due August 28, 2015. If no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 11th day of August, 2015.

                                            /s/ John Jelderks
                                           John Jelderks
                                           U.S. Magistrate Judge